# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | Criminal Action No. 23-cr-102-JLH |
| DARIUS MATYLEWICH, | : | |
| Defendant. | : | |

### DEFENDANT'S SENTENCING MEMORANDUM[1]

Darius Matylewich has lived a tumultuous and directionless life, driven by emotional and physical victimization that have left him with severe Borderline Personality Disorder and Dependent Personality Disorder. His experiences and the resulting psychological damage played a critical role in his offense conduct. Crucially, these disorders, previously unknown, are now understood and can be treated. (*See* Sealed Exhibit A – Psychological Evaluation by Dr. Laura Cooney-Koss, Psy.D.)

His actions in 2023 were impulsive, emotional, and naïve. They caused undeniable damage to a child. He engaged in behavior that is appalling from a moral and criminal perspective. Importantly, he has admitted the conduct and accepted full responsibility for it. The offense conduct itself was quickly understood, but the motivation for it cannot be simply reduced to bombastic statements regarding predatory behavior. Rather, his actions were the devastating culmination of many years of emotional and physical neglect and abuse by his parents and others. That abuse resulted in his inability to find the emotional prosocial connection that he sought through peer-aged relationships. In the years prior to the offense conduct he attempted and failed to establish connections that would fulfill his desire to be needed. Those failures pushed him to spend an increasing amount of time online,

---

[1] As always, the defense has filed an Attachment A under seal for the Court's review.

where he established the only meaningful relationships he had in his life entirely with people he never met in person. **Pre-Sentence Report ("PSR") ¶¶84-87.**

While playing an online game in May 2023 he met VF[2], the victim in this case. Prior to his contact with VF, Darius had never committed a criminal offense. Forensic evaluations of his phone show that he was engaged in no other illegal conduct. VF told him that she was thirteen (13) years old. His subsequent actions, which will be discussed in this memorandum, led to the instant prosecution. In the two years since his September 2023 arrest, he has struggled, both emotionally with the weight of his actions and physically due to multiple instances of assault and sexual violence against him at the Federal Detention Center in Philadelphia. He now faces a sentence that will see him incarcerated for not less than ten years.

It is respectfully suggested that a sentence of one hundred thirty-two (132) months, five years of supervised release, and a $100 special assessment fee is appropriate punishment. This sentence serves the interests of justice and is sufficient, but not greater than necessary, to satisfy the purposes of sentencing as set forth at 18 U.S.C. § 3553(a). This suggested sentence considers Darius's history and characteristics and the nature and circumstances of his criminal conduct.

I. <u>BACKGROUND</u>

Edward and Simone Matylewich were a mismatched pair. An army veteran and long haul truck driver, he was more than a decade her senior. Simone had a tumultuous childhood that included abuse which left her with PTSD[3]. When Darius was conceived, they were living separately and continued to do so for the first several years of his life. When they did cohabitate Edward, who did not drink or smoke, was often away driving his truck. Simone raised Darius effectively as a single mother. As the only adult in the home, her heavy drinking had a serious impact on him. Her mood was often unstable and she would make comments about his worth to her, "[I] never wanted kids." **PSR ¶80**.

---

[2] The victim in this case is referred to through this memorandum by the initials "VF" to protect her anonymity.
[3] Exhibit B – Declaration of Bahati Brown.

2

When his father was around, he was emotionally distant. He wanted a son who excelled at sports, and he made it known that Darius was a disappointment. Although their relationship was always strained, Darius wanted nothing more than his father's approval. He simultaneously idolized his father's strength and resented the poor way in which Edward treated Simone. When he was in high school Darius joined the ROTC, an organization that did not interest him, in an attempt to get his father's approval. Less than a year later, his father was dead from cancer.

Darius and his mother relocated to Delaware shortly after Edward's death. She struggled to pay the mortgage in the wake of Edward's passing and downsizing was necessary. Although she was able to maintain employment, Simone offered little else in the way of support to Darius in the wake of Edward's death. Her drinking increased as she struggled with a worsening depression. Darius too struggled with depression during that time. He felt impotent for his inability to replace his father in his mother's life. He had limited social skills and no friends. Tied to the house as a caretaker for his mother, he spent increasing time online. He formed "friendships" with people he did not know offline.

He fantasized about finding someone to spend his time with – someone who would look at him with the same respect and admiration his mother showed to his father. But when he found her, he would be everything that his father was not – he would be present and caring and emotionally available. She would love that about him. It was a fantasy in every sense: he had no idea what it meant to be in an adult relationship.[4]

What followed were a series of failed short-term relationships. He met a woman while DoorDashing and she invited him to have sex. When he subsequently learned that she had a boyfriend who had assaulted her he invited the woman to live with he and his mother.[5] The relationship ended quickly after he learned that she was using drugs. He next dated a former high school classmate with whom he connected online, but his attempts to connect 24/7 overwhelmed her and she quickly ended the relationship. He then met a woman while playing Fortnight. After learning that she was in an abusive relationship he offered to drive to New Jersey to "rescue" her. He picked her up from work and she returned to his home to

---

[4] Exhibit B ¶ 8.
[5] VF is at least the third person that Darius has brought home to live with his mother. Everyone, including the undersigned, is perplexed by why she never objected to having Darius introduce new, unknown people into the home.

live with Darius and Simone. She lived with them for a month before meeting another man online and moving out. Darius followed her online until she blocked him. He expressed that he did not understand why she blocked him.[6]

When recounting these short-lived and unhealthy romantic connections, Darius stated, "When they like me back, I grasp that feeling, and feel better about myself. I cling to that because I have always felt bad about myself."[7]

## II. OFFENSE CONDUCT

Darius was deeply depressed and at an all-time low when he and VF met online. She told him about the challenges she was facing, which included physical and emotional abuse by her mother and sexual abuse by her brother[8], and his desire to rescue was immediately activated. He believed that he was helping her when they talked. She endorsed that idea and expressed gratitude, which made him feel appreciated in a way that he craved. He stated, "She uplifted me. I had been going through so much…. I talked about my insecurities and she talked about hers. It made me feel good."[9] They were talking for nearly two months before the conversation became sexual in nature.

Although a well-adjusted adult would have seen the red flags immediately and ceased conversation, Darius saw himself as helpful and a positive influence. In hindsight he makes no excuses for his actions that followed, but recognizes that it was his desire to save that allowed him to become so enamored with this child. Regardless of his initial motivation however, he acknowledges knowing even at the time that the sexual conversation and electronic communication was wrong.

---

[6] Exhibit A at 15-16.
[7] *Id.*
[8] Exhibit A at 17.
[9] *Id.*



IV. OBJECTIONS TO THE PSR GUIDELINES CALCULATION

A. A Guideline Range of 210-262 Months is Appropriate

There is no competent evidence that Darius either engaged in sexual contact with VF or that Darius engaged in prohibited sexual conduct on more than one occasion. As such the application of the specific offense characteristic found at USSG § 2G1.3(b)(4)(A) and the enhancement found at USSG § 4B1.5(b)(1) should be removed from the guideline calculation in the PSR. These are found respectively at paragraphs fifty-seven (57) and sixty-three (63) of the Revised PSR.

The resulting total offense level should thus be thirty-seven (37) and the final guideline range should be two hundred ten to two hundred sixty-two (210-262) months.

B. Insinuation is Insufficient

Paragraph fifty-seven (57) states, without evidence, that sexual contact occurred. Both Darius and VF denied that sexual contact occurred when voluntarily interviewed by government agents. The PSR insinuates that contact occurred based on texts, chats and internet searches. Those pieces of evidence, even unchallenged, cannot rise to the level of proof that would be required to establish contact even by a preponderance. Whether there is suspicion of contact is irrelevant for purposes of this specific offense characteristic.

---

[11] Sealed Exhibit C – Bureau of Prisons Health Services Encounter Report at 3-7.
[12] *Id* at 8-16; 29-42

The Court would have to make a finding of sexual contact and should decline to do so on this record.

### C. Darius's Statements While Incarcerated

Similarly, the unsworn statements of similarly accused federal inmates to government agents cannot be relied upon to make any finding. Darius rejects that he made the statements that are attributed to him by these inmates. Undersigned counsel would welcome the opportunity to test the veracity of these inmate allegations and invites the government to produce them at sentencing. If not substantiated at sentencing - these statements, found at paragraphs forty-two through forty-four (42-44) of the PSR should be removed. The inmate statements are self-serving, contradicted by other evidence in this case, and in many ways implausible. These allegations are nothing more than an attempt by convicted felons to save themselves time off their own lengthy sentences by falsely implicating Darius in actions more nefarious than those he has admitted to in open court. Even if Darius had made those statements, it would not make them true.

As discussed above, Darius has a psychological tendency to overshare, and he often attempts to impress others as part of a positive attention seeking disorder. He admits that he shared aspects of his life with these individuals, including information about his relationship with VF and the feelings he had toward her at the time. He denies that those statements included any affirmation that there was actual sexual contact, which there was not. These inmates took the information they learned about Darius and spun it into a wild tale of sexual abuse that never actually occurred. The government had the option to reinterview VF after learning of these allegations. They have not done so. Absent testimony on the record to substantiate these inmate's wild claims, this information should be removed from the PSR.

## V. THE SPECIFIC OFFENSE CHARACTERISTIC FOUND AT USSG §2G1.3(b)(5), AS APPLIED, OVERREPRESENTS THE DEGREE OF DARIUS'S CULPABILITY WITH RESPECT TO VF'S AGE AND APPARENT AGE

Considering that VF represented herself to be thirteen years old, an age which aligns with her physical appearance, it was not unreasonable for Darius to have taken that representation as true. That honest belief, however, does not save him from the eight-

level specific offense characteristic under USSG §2G1.3(b)(5), because VF was in fact between 11 years, 8 months and 11 years, 10 months old during the offense conduct. Had the offense conduct occurred in November 2023, instead of July through September 2023, the guideline range in this case would be eighty-seven to one hundred eight (87-108) months rather than two hundred ten to two hundred sixty-two (210-262) months.

To more accurately capture criminal culpability, the guideline should be based on the subjective belief of the offender, but it is not so written. The U.S. Sentencing Commission was likely concerned with proof issues that might arise if this specific offense characteristics were written with the offender's subjective knowledge in mind. However, Courts are not so constrained when choosing how to apply the guideline and what weight to give it. This Court should consider the relative culpability of Darius to other offenders who have violated this provision and faced its draconian application. Even if the Court were to feel that some enhancement is necessary given VF's actual age, notwithstanding the representation that Darius legitimately believed, such an enhancement should not exceed three (3) levels. Accordingly, because the Court is constrained to apply the offense characteristic of eight (8) levels, the Court should vary downward by five (5) levels to offset the overrepresentation to the degree of Darius's relative criminal culpability. The resulting offense level would be thirty-two (32) and the guideline range would be one hundred twenty-one to one hundred fifty-one (121-151) months.

VI. <u>A SENTENCE OF 132 MONTHS IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY</u>

An incarceration sentence is appropriate here, but the length of that sentence need not exceed eleven years. Darius's acceptance of responsibility was quick and has been meaningful. Within hours of departing New Jersey Darius was contacted by police. He provided his address and confirmed that VF was with him. When officer's arrived he spoke with them. He was originally charged in New Jersey state court, but soon had this case adopted by the federal government. He never contested the allegations.

At no time prior to this incident, during its duration, or afterward has he engaged in any other criminal conduct. Were it not for the nature of the offense he would be

eligible for a zero-point offender reduction under USSG §4C1.1. The nature of his criminal conduct and his personal history suggest reasons for his offense behavior and offer a considerable amount of evidence that community-based treatment will prevent any risk of future criminal conduct. Under these circumstances, a sentence in excess of eleven years would be greater than necessary to meet any of the purposes of sentencing detailed in 18 U.S.C. §3553(a).

Since being incarcerated at the Federal Detention Center Darius has made every effort to improve himself and demonstrate that he is willing to do the hard work to understand his diagnosis and gain the skills he will need to re-enter society. He has taken classes and earned certificates in Developing Empathy For Victim's Psychology, Emotional Regulation Group, Self Control, My Individual Change Plan, My Starting Point, Responsible Thinkings, Basic Cognitive Skills Psychology, Healthy Relationships Psychology, Focusing on Personal Health Psychology, Traumatic Stress and Resilience Psychology, Preventing Violence Psychology, Thinking Errors Psychology, Improving My Mental Health Psychology, My Life Skills, My Healthy Thinking, Managing My Emotions, Navigating the Road Ahead, My Healthy Relationships, Mind Strength, Anger Management Psychology, Feelings Psychology, Practicing Gratitude, Coping Skills, Living a Prosocial Life, Life Management, Dialectical Behavior Therapy Interpersonal Effectiveness Group, Dialectical Behavior Therapy Emotional Regulation Skills, Basic Cognitive Skills Group, Denial, Self-Management, Family and Other Relationships, Phase one of the National Parenting Program, Maintaining Recovery, Strengthening Parenting Skills, Taking Charge of My Finances, Successful Living with a Co-Occurring Disorder, Daily Life, and Employment Skills. Moreover, he has begun to improve his relationship with God, which includes lessons in ways that he can use his incarceration to better himself spiritually. These classes include: Doing Time with Jesus, The Source of Life, The Bible – What's In It For You?, Walking the Walk, Lessons for Christian Living, What the Bible Teaches, God Is There, and Good News For All.[13]

While incarceration is mandatory and called for there is no need to imprison beyond eleven years. There is no indication that Darius is attracted to minors. Rather,

---

[13] Exhibit D – Certificates earned in the Bureau of Prisons.

any risk to reoffend is connected to his social and emotional deficits. The most effective way to treat those deficient is through counseling in the community. It is important that counseling begin as soon as possible. A significantly lengthy prison sentence will rob Darius of the opportunity to get this counseling when he is still young enough to re-enter society and be industrious.

VII. CONCLUSION

For the foregoing reasons it is respectfully requested that this Court impose a sentence of one hundred thirty-two (132) months and a period of five years supervised release with further conditions of release to be fashioned by the Court at the time of sentencing. Mr. Matylewich requests that the Court make a sentencing recommendation to the Bureau of Prisons that he be placed at an institution within California, so that he will be able to receive visitation during his incarceration from his mother and grandmother[14].

Respectfully submitted,

ELENI KOUSOULIS
Federal Public Defender

Dated: June 22, 2025

/s/ *Conor Wilson*
CONOR WILSON
Assistant Federal Public Defender
800 King Street, Suite 200
Wilmington, DE 19801
(302) 573-6010
de_ecf@fd.org

Attorneys for Darius Matylewich

---

[14] *See* Exhibit E – Letter from Simone Matylewich regarding relations to California.